IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JEREMY MULLEN, | § | |
| | § | No. 414, 2023 |
| Defendant Below, | § | |
| Appellant, | § | Court Below–Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | Cr. ID No. 2006006802 (K) |
| STATE OF DELAWARE, | § | |
| | § | |
| Appellee. | § | |

Submitted: April 26, 2024
Decided: July 16, 2024

Before **VALIHURA**, **TRAYNOR**, and **LEGROW**, Justices.

## ORDER

After consideration of the no-merit brief and motion to withdraw filed by the appellant's counsel under Supreme Court Rule 26(c), the State's response, and the Superior Court record, it appears to the Court that:

(1)     In September 2020, the appellant, Jeremy Mullen, was indicted for the rape of his half-sister Jennifer Adams.[1]  Following a four-day trial, a Superior Court jury found Mullen guilty of second-degree rape.  On October 19, 2023, the Superior Court sentenced Mullen to twenty-five years of incarceration, suspended after fifteen years for decreasing levels of supervision.  This appeal followed.

---

[1] The Court has assigned a pseudonym to the complaining witness under Supreme Court Rule 7(d).

(2)    The State's main witness at trial was Adams, who testified to the following. Adams—who was separated from Mullen (and her other half-siblings) as a two-year-old and raised by another family—reconnected with Mullen (and other family members) through Facebook in late 2019. Thereafter, Adams and Mullen began texting, and Adams attended a family party with Mullen in December 2019. In May 2020, Mullen invited Adams, who was living in Pennsylvania at the time, to visit him at his apartment in Dover, Delaware. Adams agreed to stay with Mullen the night of May 15, 2020.

(3)    The evening of May 15, Mullen, Adams, and other relatives mingled at Mullen's apartment, socializing and drinking alcohol. Mullen, who was drinking heavily, eventually began slurring his words and otherwise exhibiting signs of intoxication. The other relatives dispersed, leaving Mullen and Adams alone in Mullen's living room. At some point thereafter, Mullen FaceTimed with a woman whom Adams understood to be a girlfriend of Mullen's. Adams saw Mullen speak angrily to the woman and point a gun at his phone screen. Adams took the gun away from Mullen and tried to calm him. Mullen began woozily asking Adams if she loved him and rubbing his hands over her body. Mullen then became physically ill and vomited. After Adams cleaned up the vomit and encouraged Mullen to drink a glass of water, Mullen forcefully insisted that Adams follow him into his bedroom. Adams acquiesced, wanting to keep an eye on Mullen because she was worried that

2

he was going to be physically sick again. Mullen laid down on the bed and, once Adams believed him to be asleep, she too laid down on the bed and tried to sleep. Mullen awoke shortly thereafter and began aggressively touching Adams. Mullen eventually hiked up Adams' skirt, pulled down her underwear, and penetrated her vagina with his penis despite her repeated protests. After several minutes, Adams was able to scramble away from Mullen and flee the apartment. Adams drove back to Pennsylvania and called the Dover Police Department to report the assault around midnight on May 16. Adams acknowledged that she did not seek or submit to a physical exam and that she did not return to Delaware to speak to a police officer until June 9, 2020.

(4) The State also admitted into evidence, without objection, two sets of text messages between Adams and Mullen that had been extracted from Adams' cell phone. Mullen's many text messages to Adams from the early morning hours of May 16, 2020, through the early days of June 2020 refer to, among other things: (i) his extreme intoxication on May 15, (ii) his concern for Adams' well-being, and (iii) his embarrassment for the events that transpired on the night of May 15. The text messages also show that Adams asked Mullen to buy her a car, give her money, and provide her with a key to his apartment. The parties also entered into a stipulation (the "DNA Stipulation") that was made a court exhibit and read into the record:

> [Adams] provided her clothing she wore immediately after the alleged
> sexual intercourse occurred between her and the Defendant on May 16,

3

2020. This clothing was provided to Delaware's Division of Forensic Science and the Defendant's DNA was not matched to any of the stains that had previously been identified on the clothing.[2]

Mullen did not testify at trial.

(5) On appeal, counsel has filed a brief and a motion to withdraw under Rule 26(c). Counsel asserts that, after a complete and careful examination of the record, he could not identify any arguably appealable issues. Counsel informed Mullen of the provisions of Rule 26(c) and provided him with a copy of the motion to withdraw and a draft of the accompanying brief. Counsel also informed Mullen of his right to supplement his attorney's presentation. Mullen has raised issues for the Court's consideration, which counsel attached to the Rule 26(c) brief. The State has responded to the Rule 26(c) brief and has moved to affirm the Superior Court's judgment.

(6) The standard and scope of review applicable to the consideration of a motion to withdraw and an accompanying brief under Rule 26(c) is twofold. First, the Court must be satisfied that defense counsel has made a conscientious examination of the record and the law for claims that could be arguably raised on appeal.[3] Second, the Court must conduct its own review of the record and determine

---

[2] App. to Opening Br. at A454.
[3] *Penson v. Ohio*, 488 U.S. 75, 83 (1988); *McCoy v. Court of Appeals of Wis.*, 486 U.S. 429, 442 (1988); *Anders v. California*, 386 U.S. 738, 744 (1967).

whether the appeal is so totally devoid of at least arguably appealable issues that it can be decided without an adversary presentation.[4]

(7)     Mullen raises five arguments for the Court's consideration: (i) the prosecution's repeated reference to Adams as a "victim" was unduly prejudicial; (ii) Adams' testimony that she witnessed him show a firearm to someone on a FaceTime call was improperly admitted; (iii) the second set of text messages was improperly admitted; (iv) a text message that Mullen tried to introduce was improperly excluded; and (v) the DNA Stipulation should have been sent back to the jury during jury deliberations.  After careful review, we find no merit to Mullen's arguments.

(8)     Mullen first claims that the prosecutor and the chief investigating officer improperly referred to Adams as a "victim" and that this characterization prejudiced him in the eyes of the jury.  This Court has cautioned that the term "victim" "should not be used in a case where the commission of a crime is in dispute."[5]  Here, the Superior Court cured any prejudice that may have arisen from the use of the term to describe Adams.  After defense counsel objected to the prosecutor's use of the term in her opening statement, the Superior Court instructed the jury to disregard any reference to Adams as a victim and directed the prosecutor to advise her witnesses not to refer to Adams as a victim.  During the chief

---

[4] *Penson*, 488 U.S. at 81-82.

[5] *Jackson v. State*, 600 A.2d 21, 24 (Del. 1991).

investigating officer's testimony, he: (i) referred to Adams as a victim and immediately corrected himself on one occasion,[6] and (ii) referred to victims of sexual assault generally on two occasions. After defense counsel brought this testimony to the court's attention, the Superior Court again instructed the jury to disregard any reference to Adams as a victim. As a general rule, jurors are presumed to have followed the trial court's instructions.[7] We find that the prosecution's use of the term "victim" under these circumstances does not constitute reversible error.

(9) Mullen next argues that Adams' testimony that he threatened someone on a FaceTime call should have been excluded. We review a trial court's evidentiary rulings for an abuse of discretion.[8] Admission of a defendant's prior bad acts is governed by D.R.E. 404(b) and the so-call "*Getz* factors."[9] After defense counsel objected to the aforementioned testimony, the State made a proffer (specifically, that Mullen's display of a weapon had an effect on Adams' state of mind), the Superior Court considered the *Getz* factors and found that they weighed in favor of admitting the testimony, and the Superior Court gave an appropriate limiting instruction. The Superior Court did not abuse its discretion by admitting this testimony under these circumstances.

---

[6] App. to Opening Br. at A116 ("I was advised that the victim was now—I'm sorry—[Adams] was now in Pennsylvania and was reporting this assault.").

[7] *Revel v. State*, 956 A.2d 23, 27 (Del. 2008).

[8] *See Getz v. State*, 538 A.2d 726, 728 (Del. 1988).

[9] *Id.* at 734.

6

(10) Mullen next challenges the admission of the second of the two sets of text messages ("State's Exhibit 2") that was admitted into evidence without objection. Mullen argues that State's Exhibit 2 "cannot be traced back to [him] at all."[10] Mullen has waived this claim. Generally, the failure to raise a contemporaneous objection to allegedly inadmissible evidence constitutes a waiver of a defendant's right to raise that issue on appeal, subject to review for plain error.[11] But "the plain error standard of appellate review is predicated upon the assumption of oversight."[12] When the record reflects, as here, that the decision not to object at trial was a deliberate tactical decision by defense counsel—that is, the failure to object is *not* attributable to counsel's oversight—the failure to object constitutes a true waiver of the issue on appeal.[13] We take this opportunity to note that defense counsel cross-examined Adams extensively about the text messages that she sent Mullen and used them to undercut Adams' testimony that she felt uncomfortable around Mullen and to highlight, among other things, Adams' familiarity with "partying" and the timing of her requests for money from Mullen (specifically, the fact that she repeatedly asked him for money or other things of value before she returned to Delaware on June 9 to give a statement to the chief investigating officer).

---

[10] Ex. B to Opening Br. at 2.

[11] *Wright v. State*, 980 A.2d 1020, 1023 (Del. 2009).

[12] *Id.*

[13] *Id.*

7

Finally, to the extent that Mullen argues that his attorney was ineffective for failing to object to the admission of State's Exhibit 2, we ordinarily do not consider claims of ineffective assistance of counsel on direct appeal,[14] and we decline to do so here.

(11) Mullen next claims that the Superior Court erred by excluding a text message that he sent to Adams in which he expressed, among other things, his incredulity at Adams' rape accusation (the "Message"). Mullen's argument is predicated on Adams' admission that she received the Message and, he implies, that her admission was sufficient to authenticate the Message. It was not. The Delaware Rules of Evidence provide that the authentication requirement is satisfied when the proponent produces "evidence sufficient to support a finding that the item is what the proponent claims it is."[15] Notably, the Message was not captured by the phone extraction on June 9, 2020. And Adams testified that could not remember when she received the Message or, importantly, whether she received it before she returned to Delaware to give a statement to police. Here, Mullen claimed that the Message was sent by Mullen to Adams *at some point between May 15, 2020, and June 9, 2020*, when the contents of Adams' phone were extracted. But the Message did not have a time stamp that aligned with the previously admitted sets of text messages and it did not have a date stamp at all. Simply put, it was unclear if the Message was what

---

[14] *Desmond v. State*, 654 A.2d 821, 829 (Del. 1994).
[15] D.R.E. 901(a).

8

Mullen claimed it was—that is, a text message Mullen sent to Adams before she gave a statement to police—and the Superior Court did not abuse its discretion by declining to admit it.

(12) Finally, Mullen complains that the DNA Stipulation should have been sent to back to the jury room during jury deliberations. We review this claim for plain error because it was not raised below.[16] There is no plain error here. The DNA Stipulation was, at its core, a summary of what the State's DNA expert witness's testimony would have been. Whether to send an exhibit, including the transcript of a witness's testimony, to the jury room is a matter within the Superior Court's broad discretion.[17] The Superior Court did not abuse its discretion by declining, *sua sponte*, to send the DNA Stipulation to the jury room.

(13) The Court has reviewed the record carefully and has concluded that Mullen's appeal is wholly without merit and devoid of any arguably appealable issue. We are also satisfied that Mullen's counsel has made a conscientious effort to examine the record and the law and has properly determined that Mullen could not raise a meritorious claim in this appeal.

---

[16] Del. Supr. Ct. R. 8.

[17] *See Flonnory v. State*, 893 A.2d 507, 526 (Del. 2006) (noting our concern that "allowing the jury to have transcripts of trial testimony during their deliberations might result in the jury giving undue emphasis and credence to that portion of the testimony").

NOW, THEREFORE, IT IS ORDERED that the judgment of the Superior Court be AFFIRMED. Counsel's motion to withdraw is moot.

BY THE COURT:

*/s/ Gary F. Traynor*
Justice

10